UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| BRANDON JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. |
| CITY OF PEVELY, MISSOURI | ) | |
| | ) | |
| ANDREW K. HIXSON, | ) | |
| in his individual capacity only, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| JAMIE R. MAYBERRY, | ) | |
| in his individual capacity only, and | ) | |
| | ) | |
| DONALD J. MOORE, | ) | |
| in his individual capacity only, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S COMPLAINT
FOR FIRST AMENDMENT RETALIATION AND
FOURTH AMENDMENT ILLEGAL SEARCH AND SEIZURE
UNDER 42 U.S.C. § 1983,
FOR WHISTLEBLOWER RETALIATION UNDER § 105.055 RSMO, AND
FOR INJUNCTIVE RELIEF UNDER THE POLICE OFFICER'S BILL OF RIGHTS**

Plaintiff, Brandon Johnson, by counsel W. Bevis Schock and Erich Vieth, states the following as his Complaint for First Amendment Retaliation and Fourth Amendment Search and Seizure under 42 U.S.C. 1983, for Whistleblower Retaliation under RSMO §105.055, and for injunctive relief under the Police Officer's Bill of Rights:

**PARTIES**

1.      Brandon Johnson is an individual who at all relevant times has lived in Jefferson County, Missouri.

1

2.  The City of Pevely, Missouri, is a municipal corporation.  Since 1953 it has been properly incorporated under Missouri law as a fourth-class city.

3.  The City of Pevely qualifies as a "public employer" pursuant to RSMo. 105.055.

4.  Andrew K. Hixson is an individual currently residing in St. Louis County, Missouri.

5.  At all relevant times, Hixson was City Administrator for the City of Pevely, Missouri.

6.  Jamie R. Mayberry is an individual currently living in Jefferson County, Missouri

7.  At all relevant times, Mayberry was a police officer for the City of Pevely.  At the relevant time he was a Lieutenant.

8.  Donald J. Moore is an individual currently residing in Jefferson County, Missouri.

9.  At all relevant times, Moore was a police officer for the City of Pevely.  At the relevant time he was a Captain.

10. Johnson sues Defendants Hixson, Mayberry and Moore in their individual capacities only.

11. Defendants Hixson, Mayberry and Moore were each personally involved in the constitutional violations and other Missouri state law violations described below.

**JURISDICTION AND VENUE**

12. Johnson brings the civil rights claims herein pursuant to 42 U.S.C. § 1983 and § 1988; and the First and Fourth Amendments to the United States Constitution.

13. This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331, 1343 and 2201, with 42 U.S.C. §1983 and 42 U.S.C. 1988 being the statutes at issue.

14. With regard to Count III based on RSMo. 105.055 and Count IV based on RSMo. 590.502, this Court has supplemental jurisdiction under 28 U.S.C. § 1367 because the claims arise from the same nucleus of facts as the § 1983 claims.

15. Venue is proper in this Court under 28 U.S.C. § 1391 because the relevant events occurred in Jefferson County, Missouri, which is within the Eastern Division of the Eastern District of Missouri.

## COLOR OF STATE LAW

16. At all relevant times each of the Defendants acted under color of state law. More specifically, at all relevant times, Defendants acted under color of the laws, statutes, ordinances, regulations, policies, customs and usages of the City of Pevely and the State of Missouri.

## JURY DEMAND

17. Johnson demands a jury trial for each of his three claims for damages.

## FACTS

### Background

18. In 2020 The City of Pevely hired Johnson to serve as a police officer.

19. From the time he was hired by Pevely until he was fired in September 2025 Johnson was an excellent police officer, having excellent job reviews and having the most arrests for seizing stolen firearms, narcotics and fugitive apprehension, as tracked by the Pevely Police Department.  On August 18, 2020, he received lifesaving and officer awards of excellence.  On February 9, 2021, he received a "green pin," known as a Chief's Commendation.

20. In February 2023, Johnson was promoted to Sergeant of B-Platoon.

21. Simultaneously, Defendant Mayberry was promoted to Sergeant of A-Platoon.

### Mayberry Stealing Time

3

22.	From October 2024 to March 2025, Pevely Police Chief Mark Glenn was out on medical and/or FMLA leave.

23.	While Chief Glenn was out on medical leave, there was no chief actively running the Pevely Police Department.

24.	While Chief Glenn was out on leave, approximately four officers in the Pevely Police Department, and approximately three persons working in Dispatch contacted Johnson to complain that Mayberry was failing to show up to work during some of his scheduled shifts.

25.	This included a concern that Mayberry was reporting that he had worked shifts when he was not working.

26.	Johnson determined from his own observations that the officers' and dispatchers' concerns were legitimate and that Mayberry was indeed failing to show up during significant numbers of his shifts.

27.	On at least two occasions during November or December of 2024, in an attempt to resolve the situation informally, Johnson told Mayberry face-to-face in the Sergeant's Office that Johnson was concerned that Mayberry was not reporting his hours accurately and that Mayberry was, in fact, reporting hours that Mayberry had not actually worked.[1]

28.	Now watching more closely, over approximately the next two weeks Johnson observed that Mayberry continued this misconduct.

---

[1] Even a disclosure made to an alleged wrongdoer falls within the reach of section RSMo. 105.055, *Spurlock v. City of Columbia,* 670 S.W.3d 151, 157 (2023).

29. Johnson then contacted the City of Pevely Human Resources Department, particularly Deputy City Clerk Linda Miles and Pevely City Clerk Ashton Cooke, and reported his concerns about Mayberry.

30. Miles and Cooke told Brandon they should all talk to the Pevely City Administrator, Defendant Hixson.

31. Johnson and Miles and Cooke all forthwith walked to Hixson's office.

32. Hixson has never worked directly for or within the Pevely Police Department.

33. Upon arrival, with Miles and Cooke still present, Johnson described in detail for Hixson that Mayberry was often claiming to be working when he was not working.

34. This conversation with Hixson was detailed, lasting more than 30 minutes.

35. During this meeting Johnson was confident of the facts he was describing.

36. Johnson was making accusations that Mayberry was engaged in committing illegal acts.

37. Defendant Hixson ordered Johnson to start an investigation to substantiate Johnson's concerns, which would include collecting data regarding Mayberry's hours and pay.

38. Miles and Cooke heard Hixson give Johnson that order.

39. Hixson advised Cooke to give Johnson computer authority to see Mayberry's time records on Paylocity, Pevely's payroll software application, and Cooke did so.

40. Hixson gave permission to other employees, Miles, Cooke, Danyel Foster (a Dispatcher) and Jason Driemeier (Chief Dispatcher), to assist Johnson on this investigation, including allowing Foster and Driemeier to have Johnson review the Omnigo ITI Software, a system utilized by Pevely for dispatch.  Omnigo ITI would show Mayberry's comings and goings.

41. Miles and Cooke assisted Johnson in gathering data by logging into a computer and reviewing Mayberry's records regarding hours and pay.

42. Miles and Cooke asked Johnson whether Mayberry had been at work on particular days.

43. For some of those days, Johnson knew that Mayberry had not been at work because although Johnson and Mayberry were on opposite shifts Mayberry was putting in time for shifts worked by Johnson, and Johnson knew Mayberry had not been there for those shifts.

44. For some other shifts Mayberry was supposed to be working his own shift, but did not show.  Officers who would have been working under him had he been there called Johnson to come in because Mayberry was not there.  Johnson did work several shifts under those circumstances.

45. Miles, Cooke and Johnson examined timesheets and weekly pay of Mayberry.  Johnson located at least 15 inconsistencies between the days Mayberry claimed to work and the actual facts based on Johnson's personal recollections that Mayberry was not working on those days.

46. During this time the Pevely Police Department had approximately 20 employees.

47. Early in the period of Chief Glenn's leave, before Johnson was aware of the problems with Mayberry's time records, City Administrator Hixson, Mayberry, and Johnson went to Arby's to eat, and during the meal Hixson orally asked Johnson and Mayberry to fulfill some of the duties of the Chief, including but not limited to overwatching squads, compiling time sheets, and handling complaints.

48. Johnson and Mayberry each verbally agreed to do so.

49. Neither Johnson nor Mayberry received additional pay for this additional work.

50. Johnson did the additional work.

51. Mayberry did not do the additional work.

52. During Chief Glenn's absence Johnson's shifts were busy because he was doing his normal work as a sergeant, plus working on patrol, and was also fulfilling some of the duties of the chief as stated above.

53. After Hixson directed Johnson to investigate Mayberry, Johnson examined documents related to Mayberry's reports of hours worked and not worked.

54. With the help of others at the office, Dreimeier and Foster for cameras and Miles for time sheet records, Johnson verified his concern that Mayberry was claiming pay for work not done.

55. In December 2024, which was within a reasonable time of receiving his assignment from Hixson Johnson, using others' work as well as his own, finished an Excel spreadsheet which had been started by Cooke and which documented the discrepancies between Mayberry's claims for time worked and his actual time worked.

56. There were some minor discrepancies before Chief Glenn went on medical leave, but after that time there were major discrepancies.

57. On February 11, 2025, Johnson wrote a memo to Hixson outlining some aspects of the problem with Mayberry stealing time.

58. That memo included the statement that Hixson had directed Johnson to conduct an investigation.

59. Later, but still in early 2025, Johnson, Miles and Cooke met with Hixson in his office and used a projector to examine the data and charts.

60. Johnson documented for Hixson that Mayberry had falsely claimed a total of approximately $25,000 in time at approximately $28.55 per hour through the end of 2024, and then at $31.55 per hour thereafter.  Johnson and Mayberry were making the same amount.

61. Johnson explained to Hixson that the hours falsely claimed would come to about $20,000, but that a forensic accountant would be needed to determine the value of the vacation, sick leave, comp time and overtime, and the need to call other officers in when they did not have enough help.  Johnson estimated those additional costs at $5,000.

62. After being shown the evidence Hixson looked hesitant.

63. Hixson had previously told Johnson and others that then Mayor Stephanie Haas was concerned about police department operations, and about competition in the next election, and was putting Hixson under pressure to present a façade of orderliness within the police department.

64. Johnson asked Hixson "Are we calling the highway patrol or the sheriff's office? Who will prosecute this?"

65. Hixson said, "I'm bringing in Mayberry to tell him he has to report time properly."[2]

66. Johnson thought to himself, "Is this all that's going to happen?"

67. Hixson indeed did call another meeting in his office a few days later.  The attendees were Johnson, Mayberry and Hixson.  The meeting lasted five minutes or less.

68. Mayberry looked nervous.

---

[2] Many of the allegations in this complaint concern statements.  Johnson often describes the statements using quotations but all such statements should be read here as "words to the effect of."  They are not exact quotes.

69. Hixson said they were both doing a great job and that they needed to report their time accurately.

70. Hixson did not deliver any other directive or any warning to Mayberry.

71. Hixson did not accuse Mayberry of claiming pay for hours he didn't work.

72. Hixson did not state that Mayberry would be docked for the time he had not worked but for which he had received pay.

73. Johnson thought to himself "Is that all?"

74. Hixson did not give Johnson any directive whether to drop the entire matter or to continue to be concerned about Mayberry missing time.

75. Miles and Cooke continued looking at Mayberry's time sheets.

76. A few pay periods after this meeting Miles and Cooke again provided Johnson access to Mayberry's timecards for days worked, and they noted that for various time periods after the above referenced meeting Mayberry was continuing to claim time he hadn't worked.

77. Haas lost the April 2025 mayoral election.

78. On April 8th, 2025, Steve Markus was sworn in as the newly elected Mayor of Pevely.

79. A few days later, because no one from Pevely had taken any action regarding Mayberry's misconduct, Johnson called the Mayor's cell phone and asked to meet with him about "serious issues you need to be aware of."

80. Johnson had the Mayor's cell phone because the police supervisors, including Johnson, had a sheet with all the Aldermen's cell numbers and the Mayor had previously been an Alderman.

81. On Wednesday, April 16, 2025, Markus responded to Johnson's request to meet and invited Johnson to his home.

82. Johnson met Mayor Markus in Markus's garage for over an hour and discussed Johnson's investigation of Mayberry.

83. Johnson explained that he had gone to Human Resources, that Human Resources had told him to go to Hixson and that Johnson had done that, but that Hixson had done nothing.

84. By the conclusion of the meeting Mayor Markus understood that Mayberry's false reports of time-worked were substantiated by information Johnson had gathered.

85. During the meeting Johnson voiced his concern that his investigation was being ignored.

86. Johnson had brought a flash drive with the evidence for Mayor Markus to review, but the Mayor said he wasn't technically savvy and he said he would talk about it with Hixson and the City Attorney, Allison Sweeney.

87. During the meeting Johnson also explained to the Mayor that Mayberry had told him over the prior months that he (Mayberry) and Sweeney were close friends and that she routinely told him about City business.

**Johnson's Meeting with Pevely City Attorney Allison Sweeney**

88. On Thursday April 24, 2025, pursuant to an earlier email from Hixson, all city employees, police officers, administrative personnel, street workers, etc. came to the City's court room for a meet and greet with the new Mayor and to have lunch. There were speeches about how the Mayor would move the City forward, etc.

89. At the conclusion of the lunch Sweeney, who had been at the meet and greet, asked Johnson to stay for a moment because "we need to talk."

90. Johnson and Sweeney went to Hixson's office.

91. For the first around five minutes of the meeting the only two persons present at the meeting were Sweeney and Johnson. During this period Sweeney and Johnson engaged in small talk.

92. Hixson then joined the meeting.

93. Sweeney shut the door and partially closed the blinds.

94. Sweeney then started a formal conversation, stating to Johnson, "I want to talk to you about your investigation, which you did on your own."

95. Sweeney told Johnson he could not go to the Mayor's house to discuss an allegation of misconduct by either another officer or Hixson.

96. Sweeney told Johnson he was a great officer.

97. Sweeney then accused Johnson of conducting a rogue investigation.

98. Hixson remained silent while Sweeney made this false accusation.

99. Johnson felt that the stealing of time by Mayberry was being swept under the rug because Sweeney, Hixson and Mayberry were all close friends.

100. Sweeney told Johnson:  "You violated Mayberry's Officer Bill of Rights."[3]

101. Johnson felt that because he had been directed to conduct the investigation by Hixson he had done nothing wrong.

102. Johnson therefore orally denied that he had violated Mayberry rights under the Police Officer's Bill of Rights.

103. Sweeney then said, "You went to the new mayor's house and complained about Mayberry and Andy."

---

[3] RSMo. 590.502.

11

104. Johnson was stunned that Hixson did not speak up to admit that that it was Hixson who had instigated the investigation and told Johnson to investigate Mayberry.

105. Johnson asked if he was in trouble.

106. Sweeney and Hixson again told Johnson he was a good officer and Sergeant.

107. Johnson sensed trouble. It was two against one, and Johnson realized his efforts to stop stealing by Mayberry were likely to be futile. Johnson therefore did not directly accuse Hixson of failing to properly admit that he had directed Johnson to conduct the investigation.

108. Sweeney then told Johnson that Mayberry had been put on a "secret mission assignment" that Brandon was not privy to.

109. Sweeney further claimed that this related to Mayberry helping the Chief with a secret assignment for City of Pevely business.

110. Johnson believed what Sweeney was saying was nonsensical.

111. Johnson looked at Hixson, but Hixson continued to remain silent about his own directive to Johnson the prior winter to begin an investigation.

112. Hixson told Johnson, "You're a great officer and Sergeant, but there are certain things you cannot do."

113. Sweeney then interjected, "Like going to Mayor Markus' residence and complaining."

114. Johnson then said: "The Mayor needed to be aware of the situation – Mayberry is not showing up for work."

115. Sweeney then again falsely claimed that Mayberry was on a secret mission.

116. Johnson said "No, it's not his job to do secret assignments."

117. Johnson thought to himself: We are local city cops. Local city cops don't do secret missions.

118. Sweeney then badgered Johnson, saying: "You just don't know important things. Why did you speak to the Mayor?"

119. Johnson replied, "I spoke to the Mayor due to the fact Mayberry was still disregarding calls for service and I was receiving complaints from dispatch and officers, which included Mayberry not showing up to work."

120. Johnson also stated, "Because nothing was being done about Mayberry."

121. Sweeney then stated, "You shouldn't have spoken to the Mayor."

122. Johnson again asked, "Am I in trouble?"

123. Sweeney replied, "No, but you need to be careful about who you talk to."

124. Hixson then stated, "You are a good cop. We just need you to stay in your lane."

125. Brandon then reinforced to himself in his mind his conclusion that Sweeney and Hixson were sweeping the investigation under the rug.

126. Johnson knew there had been prior infighting between City officials, much of which had played out on social media, and he thought that infighting was a contributing factor to the failure to discipline Mayberry.

127. The meeting lasted approximately 45 minutes.

128. Never during that meeting did Hixson admit that Hixson himself had initiated the investigation of Mayberry by telling Johnson to go forward.

129. In this meeting, Sweeney told Johnson that she had recently turned over Johnson's investigation materials to Mayberry.

130. In this meeting Johnson felt defeated and knew that Hixson was involved in a cover-up.

131. Johnson did not further confront Hixson at this meeting.

132. At the time of this meeting Johnson knew of another incident from 2024 where an officer from the St. Louis County Police Department was criminally charged for logging hours he had not worked.[4]  Johnson also knew that Mayberry falsely logged far more false hours than that officer from St. Louis County.

133. Defendant Hixson had refused to take any steps to prosecute Mayberry with Johnson's evidence of Mayberry's wage theft for months.

134. Chief Glenn, who had returned to work from FMLA in March 2025 had always recognized that Johnson was an excellent officer and supported his work with the police department.  For example, he had Johnson handle scheduling and complaints.

135. Any violations of Mayberry's rights under the Police Officer's Bill of Rights are the responsibility of Hixson because Hixson told Johnson to conduct the investigation.

136. Johnson then wrote a memorandum summarizing the investigation, sent it to Hixson in order to shift the responsibility to Hixson, and Johnson did nothing further to investigate Mayberry.

137. After that meeting Hixson and Johnson had few conversations.

### Captain Donald J. Moore

138. In March 2025, Mayberry was promoted to Lieutenant and the City hired Moore as a Captain.

139. At that time Johnson was in charge of certifying officers' weapons.

---

[4] https://www.ksdk.com/article/news/crime/st-louis-county-police-sergeant-work-hours-thanksgiving-branson-charges-say/63-a2778886-e67a-4b42-8a84-077f2eb14ce6

14

140. Johnson declined to certify the weapon Moore was carrying because it was neither a City issued weapon nor an approved secondary weapon.

141. Johnson told Moore his weapon was not certified, but Moore did nothing to change out his weapon for a certified weapon.

142. Approximately two weeks after Moore started Johnson brought to Chief Glenn's attention that Moore's weapon was not certified, and that he was also not wearing proper issued body armor, body camera or holster.

143. Over the ensuing months Moore was hard charging on procedure and on officers following the chain of command.

144. Moore shouted at officers, threatened to write them up and turn them in to Human Resources, and he told officers they could not complain to their Union. He would interrupt officers trying to discuss police matters with him, and he would shout them down and not listen.

145. Patrol officers, who were below Johnson because Johnson was a Sergeant, came to Johnson and complained about Moore's conduct.

146. Johnson told them that if they wanted to complain formally, they would have to write up their complaints and send them to Hixson.

**Moore Violates a Citizen's Fourth Amendment Rights, Ensuing Events**

147. On July 10, 2025, Pevely Officer Joseph Beil responded to a 911 call to assist EMS at a private home regarding an approximately three-year-old child with a head injury.

148. Beil called for backup and Johnson and Moore responded.

149. By the time Johnson arrived the child was on the way to the hospital.

150. While at the house Moore noticed an unloaded handgun on a shelf approximately 5 ½ feet off the ground and he told Beil to seize the gun.

151. Johnson questioned Moore's reasoning to his face because Johnson knew that seizing the gun was unconstitutional because Moore had no lawful reason to seize the gun and the homeowner had a Second Amendment right to have the gun, and the gun was not in a location where it would be accessible to the child.

152. Beil seized the gun and it was taken to the station.

153. On July 14, 2025, Johnson wrote up a Complaint Memorandum about Moore's conduct at the scene, plus other related actions undertaken by Moore later, and sent it by email to Chief Glenn and to Local 42, Johnson's union.

154. The Complaint Memorandum described the dispute over seizure of the firearm.

155. In August 2025, soon after "Pevely Days," Johnson and approximately seven other officers complained in writing to Mayberry and the Chief about Moore's on-the-job performance during Pevely Days.

156. The particular complaint was that Moore said an officer was not in the correct position, but the officer had not been given an assigned position, and Moore threw a key chain or key ring at the officer, and it struck the officer in the chest.

157. There were other complaints from other officers, all of which were submitted at the same time.

158. Approximately six months after the meeting with Sweeney in Hixson's office, in August 2025, the department opened an Internal Investigation of Capt. Moore in which Johnson was declared by the Department to be a witness not accused of any wrongdoing.

159. On or about August 25, 2025, Mayberry sent a memo to all Department members above the rank of patrolman stating that the Department had started an internal investigation of Moore's behavior as an officer.

160. After that date, approximately in late August, the City fired Chief Glenn.

**Blow-Up by Moore over Holster Issue**

161. On August 15, 2025, Johnson was brought into a meeting with Mayberry and Moore.

162. Moore became highly heated and angry at Johnson over Johnson's concerns, which were legitimate, that Moore had an unauthorized, non-Department issued holster.

163. Moore threatened Johnson with discipline but did not impose discipline.

164. The nature of the meeting reflected the hostility of Mayberry and Moore toward Johnson.

165. On August 17, 2025, Johnson wrote a grievance to Hixson describing Moore's conduct at the meeting.

**Investigation of Johnson for Johnson's Investigation of Moore,
Johnson Put on Administrative Leave**

166. In approximately late August 2025 Moore coordinated with Mayberry to start an investigation of Johnson regarding Johnson's involvement with the investigation of Moore for Moore's violation of a citizen's Fourth Amendment rights at the site of the child injury.

167. At approximately this time Mayberry and Moore wrote up Johnson for four separate allegations, including interfering with an investigation, failing to take a report on an alleged violation of an Ex Parte Order of Protection, being insubordinate, and disregarding an order and not securing property.

168. None of those allegations had merit.

169. An Internal Affairs investigation of Johnson was started and Johnson was put on administrative leave pending the outcome of the investigation.

170. On inference, the Internal Affairs investigation of Johnson was a pretext, and only an attempt to drum up a reason for Defendants to fire Johnson for reporting the corruption of Mayberry.

### Chief Glenn Leaves, Johnson Applies to be Chief

171. While Glenn was Chief of Police he protected Johnson's employment.

172. Pevely terminated Chief Glenn on August 26, 2025, and Pevely forthwith opened up for applications for Chief.

173. On September 4, 2025, Johnson applied to be Chief.

### Johnson Put on Administrative Leave

174. On or about September 8, 2025, Hixson, Moore and Mayberry met with Johnson in Hixson' office and handed Johnson an Internal Affairs investigation report.  Mayberry told Johnson that he had been put on administrative leave, and demanded that Johnson immediately turn in his gun, badge, keys, proximity card, and other items and leave the premises and not return pending further notice.

175. Johnson complied.

### Moore Goes Into Johnson's Private Computer Records
### Violates Johnson's Right to be Free of Unreasonable Search

176. On Thursday, September 11, 2025, while Johnson was on administrative leave at approximately 0948 hours, Moore, still a Captain, went into Johnson's office, also known as the "Sergeant's Office."

177. A video captured Moore's entry into the Sergeant's office.

178. At that time Johnson was the only one using that office.

179. At that time Johnson, because he was on administrative leave, had no physical access to the Department desktop computer which had been assigned to Johnson and was in that office, or to any other part of the physical premises of the Pevely Police Department.

180. In that office was a computer on which there was proper Pevely related police information.

181. The computer required a password rather than a four-digit pin.

182. The computer could also be used by Johnson by using his password, to access his personal Google cloud financial records and other private information.

183. It was a common practice for employees of the police department to use computers for such purposes, including minor matters like checking bank balances, private calendar issues such as times for child pickup, health records, personal emails, union related emails etc.

184. To Johnson's belief only he knew his computer password.

185. Nevertheless, once a user had used the password and had the computer open, the user could access Johnson's personal, private cloud information through a browser.

186. Johnson was the Facebook public relations administrator for the Department.

187. Johnson normally used his personal profile on Facebook to perform his function as the Department Facebook administrator.

188. On September 11, 2025, at 9:50 a.m. Johnson received notifications on his cell phone from Google and Microsoft that someone had accessed his accounts and his personal data.

189. On inference, Moore contacted "Forward Slash," a private computer company which worked with the Pevely police department, to obtain Johnson's password for the Facebook work, to log onto the computer.

190. On inference, Moore obtained and used Johnson's password from Forward Slash to access the computer itself, and then to search Johnson's personal information.

191. Johnson knows of no other way Moore could have accessed the information on that computer.

192. Moore must have taken the affirmative step of entering the password and clicking on it.

193. At that point it would have been obvious to any reasonable person that the information being shown in Johnson's private Google Drive and Microsoft accounts was personal.

194. On inference, Moore searched through Johnson's personal data.

195. Johnson then received notification that someone had entered one or more search inquiries in his Google Drive page.

196. Pevely Police Department had no rules or regulations applying to personal use of the workstation in the Sergeant's room or at any other location in the Pevely Police Department.

197. Reciprocally, the Pevely Policy Department did not have any computer policy giving any Department person the right to access personal information.[5]

198. Moore was in the office for approximately 30 minutes.

199. Johnson never gave Moore permission to access Johnson's personal information.

200. Moore had neither probable cause nor a warrant to engage in a search of Johnson's personal information.

---

[5] *U.S. v. Bailey,* 272 F.Supp.2d 822, 836 (2003).

20

201. Johnson does not know exactly what personal information Moore looked at, but because Moore entered search requests on Johnson's cloud drive, it is a reasonable assumption that he looked at some of Johnson's personal information.

202. Mayberry later admitted that Moore had been in Johnson's office.

203. Johnson had a reasonable expectation of privacy that his personal data would not be accessed on that workstation.[6]

204. Johnson's expectation of privacy was both an actual subjective expectation and an expectation that society accepts as reasonable.

205. Moore's actions constituted a search for purposes of the Fourth Amendment in that Moore violated Johnson's reasonable expectation of privacy.[7]

206. The Fourth Amendment guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government, without regard to whether the government actor is investigating crime or performing another function.[8]

207. Moore's intrusion on Johnson's expectation must be judged by the standard of reasonableness under all the circumstances.[9]

208. The use of a workstation password to restrict others' access to Johnson's computer, and the requirement of a password to get into the personal data, even though the computer provided that latter password once a user was on the computer, led Johnson to have an expectation of privacy in his personal files that were accessed by Moore.[10]

---

[6] A constitutional privacy claim "depends upon whether Johnson had a reasonable expectation of privacy in the information." *Bass v Anoka County,* 998 F.Supp.2d 813 (D. Minn 2014).
[7] *Bass v Anoka County,* 998 F.Supp.2d 813 (D. Minn 2014).
[8] *City of Ontario, Cal. v. Quon,* 560 U.S. 746, 756 (2010)
9 *City of Ontario, Cal. v. Quon,* 560 U.S. 746, 757 (2010).
10 *U.S. v. Bailey,* 272 F.Supp.2d 822, 835 (2003).

209. Moore's search was not motivated by a legitimate work-related purpose.

210. Moore's search was excessive in scope.

211. Moore's search was not reasonable.

212. Other police officers also kept their personal records on their work computers, and each officer had his/her own personal login credentials to their own workstation.

213. Moore's search violated Johnson's Fourth Amendment right to be free of unreasonable search.

214. On the day of the incident Johnson sent a text to Dave Reagan, Johnson's Local 42 representative, complaining about the search.

### Finalization of Termination, Was Disciplinary Action

215. On September 26, 2025, Mayberry and Moore personally delivered to Johnson a letter from Hixson informing Johnson that he was terminated.

216. On September 26, 2025, Mayberry and Moore delivered that termination letter to Johnson's house.

217. The letter consisted of one sentence: "Based on the findings that Lt. Mayberry found in IA 25-2, you are no longer employed with the City of Pevely."

218. Johnson's termination was a "disciplinary action" under the Whistleblower Act, RSMo. 105.055.1(1).[11]

### Termination was Retaliatory under First Amendment

219. The termination of Johnson was retaliatory for Johnson's challenges to Mayberry, Moore and Hixson as stated above.

---

[11] *Richest v. City of Kansas City,* 643 S.W.3d 610, 614 (2022).

22

220. Mayberry, working with Hixson, investigated Johnson knowing that the pretextual charges against Johnson were not asserted in good faith.

221. Mayberry and Hixson personally participated in the retaliation against Johnson.

222. Mayberry served as both complainant and investigator.

223. Johnson exercised his First Amendment rights when he expressed his concerns regarding Mayberry's false claims of time worked to Mayor Steve Markus, Pevely City Attorney Allison Sweeney and Pevely Administrator (Defendant) Hixson.

224. On inference, Mayberry and Moore attempted to get Johnson fired based on Johnson's personal involvement in the above-described investigation of Mayberry.

225. On inference, Mayberry personally participated in the sham investigation of Johnson in order to retaliate against Johnson for exercising his First Amendment rights.

226. All Johnson did was gather information and give it to Hixson.

227. Johnson neither conducted administrative questioning of Mayberry nor brought charges against Mayberry.

228. Any violations of Mayberry's rights by Johnson under the Police Officer's Bill of Rights, RSMo. 590.502, in which Johnson participated were done at the behest of Hixson.

229. Even if the investigation of Mayberry did violate Mayberry's rights under the Police Officer's Bill of Rights, and Johnson denies any responsibility for that, that does not immunize the City or the individual defendants from the claims herein.

230. When Johnson communicated his concerns about police department corruption he acted as a citizen, outside the chain of command of the police department.[12]

---

[12] *Garcetti v Ceballos,* 547 U.S. 410 418 (2006)

231. Persons with whom Johnson communicated outside the department included Hixson (Pevely City Administrator), Sweeney (City Attorney for Pevely), and Steve Markus (Mayor).

232. To the extent that Johnson communicated his concerns to Hixson, Sweeney and Markus, he was engaging in protected activity because he was speaking as a citizen on matters of public concern.[13]

233. On the City's organizational chart, the Chief of Police reported to the Mayor, not to City Administrator Hixson

234. The Mayor was not part of the Department.

235. Although Hixson had the power to fire Johnson, (and did so), Hixson was not in Johnson's chain of command in the Pevely Police Department.

236. Johnson's reports to Hixson, Sweeney and Markus regarding Mayberry's false wage claims were not made pursuant to Johnson's professional responsibilities and duties with the Police Department.[14]

237. Johnson's reports were of sufficient public and social importance to override the Department's substantial interest in maintaining the efficiency and reputation of the workplace, given the nature of the office.[15]

238. Johnson's speech did not create workplace disharmony, impede his performance or impair working relationships.

---

[13] *Noon v. City of Platte Woods, Missouri,* 94 F.4th 759, 764 (2024).
[14] *Garcetti v. Ceballos,* 547 U.S. 410 (2006).
[15] *Noon v. City of Platte Woods, Missouri,* 94 F.4th 759, 766 (2024).

24

239. Johnson's First Amendment interest is entitled to more weight given that he was acting as a whistleblower exposing government corruption.[16]

240. Johnson's speech regarding Mayberry's illegal misconduct occupies the highest rung of First Amendment hierarchy.[17]

241. Johnson's termination had nothing to do with the Internal Affairs Investigation announced on September 3, 2025. That investigation was instead a pretext to hide Defendant's retaliation.

242. Johnson's First Amendment speech regarding Mayberry's illegal misconduct was what counted in his termination. [18]

243. Mayberry had the power to discharge Johnson.

244. Mayberry was Johnson's "supervisor."[19]

245. Mayberry took disciplinary action against Johnson in his capacity as supervisor of Johnson.[20]

246. Johnson disclosed information to Hixson, Sweeney and Markus that he reasonably believed provided evidence of prohibited activity or suspected prohibited activity.

---

[16] *Noon v. City of Platte Woods, Missouri,* 94 F.4th 759, 765 (2024).

[17] *Noon v. City of Platte Woods, Missouri,* 94 F.4th 759, 765 (2024).

[18] *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 272-73 (2016).

[19] "The dictionary defines "supervisor" as "one that supervises . . . a person, group, department, organization or operations as a: such a person having authority delegated by an employer to hire, transfer, suspend, recall, promote, assign, or discharge another employee or to recommend such action." *Miller v. Missouri House of Representatives,* 725 S.W.3d 650, 658 (2025).

[20] Section 105.055.1(1) defines Disciplinary action as
   any dismissal, demotion, transfer, reassignment, suspension, reprimand, warning of possible dismissal or withholding of work, regardless of whether the withholding of work has affected or will affect the employee's compensation.

247. Lines of authority in Pevely were somewhat blurred at that time particularly in the absence of a Chief, but there was still a chain of command, and Hixson, Sweeney and Markus were not in it.

**Reiteration of Allegations Pertaining to Count III, State Law Whistle Blower Claim**

248. Count III is brought pursuant to RSMo. § 105.055.7, which authorizes a civil action against a public employer for damages when a public employee suffers disciplinary action in retaliation for whistleblowing.

249. At all relevant times, Johnson was a "public employee" of Pevely.[21]

250. Mayberry was one of Johnson's supervisors.[22]

251. As alleged above, Johnson made protected disclosures of information he reasonably believed evidenced mismanagement, gross waste and/or stealing of public funds by claiming time worked which was not worked, abuse of authority, violations of a citizen's Fourth Amendment rights, and violations of law and policy regarding proper police equipment.

252. Hixson, Mayberry, Moore and the City of Pevely took adverse disciplinary action against Johnson—specifically, termination—because of those protected disclosures.

253. Johnson's investigation and reports concerning Defendant Mayberry's falsification of time records and claiming pay for hours not actually worked, and concerning Moore's violation of a citizen's Fourth Amendment rights, constituted disclosures of information that Johnson reasonably believed evidenced (a) a violation of law, rule, or regulation and/or (b) mismanagement, a gross waste of public funds, and/or stealing of public funds

---

[21] As that term is defined in RSMo. § 105.055.1(2).
[22] See RSMo. § 105.055.2.

26

by claiming time worked which was not worked, abuse of authority, and (c) violation of City policy.

254. Johnson made these protected disclosures to Hixson and Mayberry.

255. Johnson made the protected disclosures regarding Mayberry's falsification of time records outside the chain of command to Deputy City Clerk Miles and Pevely City Clerk Cooke.

256. Johnson also made these protected disclosures during the April 24, 2025, meeting to City Attorney Sweeney.

257. Johnson also made the protected disclosures regarding falsification of time records externally and directly to the newly elected Mayor Markus at the Mayor's residence, including offering a flash drive containing the supporting data.

258. Johnson's investigation and reports concerning Defendant Moore's Fourth Amendment violations related to a violation of the United States and Missouri Constitutions.

259. Johnson also made all these protected disclosures regarding Moore internally to Human Resources and Hixson.

260. No supervisor or appointing authority of the City of Pevely had a lawful right to take any disciplinary action against Johnson for making these protected disclosures.[23]

261. Johnson's termination on September 26, 2025, constituted "disciplinary action" within the meaning of RSMo. § 105.055.1(1).

262. Johnson timely commenced this civil action within one year after the occurrence of the alleged violation, as required by RSMo. § 105.055.7(1), i.e., one year after Defendant City of Pevely's Sept 26, 2025, termination of Johnson.

---

[23] RSMo. § 105.055.3(1).

# DAMAGES

## Garden Variety Emotional Distress

263. As a result of the above, Johnson has suffered garden variety emotional distress, including but not limited to nervousness, anxiety, worry, shock, humiliation, embarrassment, indignity, mental anguish, inconvenience, loss of enjoyment of life, lowered feelings of self-worth, weight gain, nightmares, and fear for the community due to the misconduct of its leadership.

## Economic Damages

264. After his termination Johnson found work after approximately three weeks. His lost wages were approximately $1,300.00 per week for those three weeks of lost work for a total approximately $3,900.00.

265. At the time of his termination Johnson was approximately one month shy of the five years of full-time work needed for pension with LAGERS to vest.

266. As a result of his termination all that time toward vesting has been lost.

267. Johnson could work in the future at a police department with LAGERS and reactivate the process but at the present time he does not have a way to complete that final month.

268. The firing thus cost him an income stream at retirement in an amount to be determined in discovery.

## Punitive Damages Regarding Constitutional Violations

269. The conduct of Hixson, Mayberry, and Moore in the § 1983 claims was malicious or recklessly indifferent to Johnson's clearly established rights under the First and Fourth Amendments to the United States Constitution.

270. Hixson, Mayberry, and Moore knew of or acted with reckless disregard of the fact that causing Johnson's termination in retaliation for his protected First Amendment activity—reporting suspected mismanagement, gross waste of public funds, abuse of authority, and possible time theft by a superior officer to City HR personnel, the City Administrator, the City Attorney, and the Mayor—violated Johnson's constitutional rights.

271. Moore knew, or acted with reckless disregard of the fact, that intentionally accessing and searching Johnson's work computer and the linked personal cloud storage accounts (OneDrive and Google Drive), including personal files, emails, credit-card information, and other private data, without authorization or consent, violated Johnson's Fourth Amendment right to be free from unreasonable searches and seizures.

272. The retaliatory termination and the unlawful search of Johnson's private digital information were each motivated by evil motive or intent and/or involved reckless or callous indifference to Johnson's federally protected constitutional rights.

273. The offensive conduct of each individual Defendant calls for deterrence and punishment over and above that provided by compensatory awards.

274. Johnson therefore seeks punitive damages against Defendants Hixson, Mayberry, and Moore in their individual capacities only.[24]

275. The offensive conduct of Defendants calls for deterrence and punishment over and above that provided by compensatory awards, and their conduct was motivated by evil motive or intent, and/or involved reckless or callous indifference to the federally protected

---

[24] "We hold that a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. We further hold that this threshold applies even when the underlying standard of liability for compensatory damages is one of recklessness." *Smith v. Wade,* 461 U.S. 30, 56 (1983)

constitutional rights of Johnson.[25]

## CAUSATION

276. All the damages suffered by Johnson were the direct and proximate results of the actions of Defendants as described above.

## NO QUALIFIED IMMUNITY FOR CONSTITUTIONAL CLAIMS

277. No Defendant is entitled to qualified immunity on Count I, Johnson's 1983 claims for retaliation based on the First Amendment because the law related to Count I was clearly established or the alleged conduct is an obvious case justifying liability and damages. For example, the 8th Circuit's Opinion in the cookie-cutter case of *Noon v City of Platte Woods,* 84 F.4th 759 (8th Cir. 2024).  See also *Woods v. City of St. Louis, Missouri*, 170 F.4th 1164, 1174 (8th Cir. 2026).  *Noon* involved terminated police officers who sued for First Amendment retaliation. Johnson was discharged from his job with the Pevely Police Department on Sept 26, 2025, a year and a half after that opinion was released.

278. Defendant Moore is not entitled to qualified immunity regarding Count II, Johnson's 1983 claim for violation of the Fourth Amendment, because the law related to Count II was clearly established or the alleged conduct is an obvious case justifying liability and damages.  See *City of Ontario, Cal. v. Quon*, 560 U.S. 746, 756 (2010), *O'Connor v. Ortega,* 480 U.S. 709 (1987), *U.S. v. Bailey,* 272 F.Supp.2d 822, 836 (2003) and *Bass v Anoka County,* 998 F.Supp.2d 813 (D. Minn 2014).

## POLICE OFFICER'S BILL OF RIGHTS, RSMO. 590.502

279. When Johnson was put on administrative leave on September 8, 2025, a reasonable officer in his position would have believed that the investigation could lead to

---

[25] *Naucke v. City of Park Hills*, 284 F.3d 923, 929 (8th Cir. 2002).

disciplinary action, demotion, dismissal, transfer, or placement on a status that could lead to economic loss.

280. When Johnson was terminated on September 26, 2025 he suffered an economic loss.

281. Johnson's rights under the Police Officer's Bill of Rights, RSMo. 590.502 were violated in the following ways:

    a.    Johnson was not informed at the beginning, in writing, of the existence and nature of the alleged violations, § 2(1),

    b.    Johnson was not informed at the end, in writing, of the investigative findings, § 2(12).

## ATTORNEY'S FEES AND COSTS

282. In pursuit of his constitutional claims, Johnson is incurring reasonable statutory attorney's fees, taxable costs, and non-taxable costs compensable under 42 U.S.C. § 1988.

283. In pursuit of his state law whistleblower claims, Johnson is incurring reasonable statutory attorney's fees, taxable costs, and non-taxable costs compensable under RSMo. 105.055.7(4).

## COUNT I

### 42 U.S.C 1983:  TERMINATION IN RETALIATION FOR EXERCISE OF FIRST AMENDMENT RIGHTS AGAINST HIXSON, MAYBERRY AND MOORE IN THEIR INDIVIDUAL CAPACITIES

284. Johnson incorporates all prior paragraphs.

285. *First*, Defendants Mayberry, Hixson and Moore discharged Johnson from the Pevely Police Department; and

286. *Second*, Johnson had previously reported misconduct of his fellow employees to city officials;

31

287.    *Third*, Johnson's reports to city officials were a motivating factor in the Defendants' decision to discharge Johnson;[26]

288.    *Fourth*, as a direct result Johnson was damaged.[27]

289.    Defendants stated reasons for Johnson's termination were not the real reasons, but were pretextual reasons to hide retaliation.

290.    The conduct of Defendants described in this Count was malicious or recklessly indifferent to Johnson's First Amendment rights, and therefore Johnson is entitled to punitive damages.

WHEREFORE, Johnson prays for compensatory damages and for punitive damages for retaliation for exercise of first amendment rights against Defendants Mayberry, Hixson and Moore in their individual capacities in a fair and reasonable amount, for reasonable attorney's fees, for costs, and for such other relief as the court finds to be just, meet and reasonable.

## COUNT II

### 42 U.S.C 1983 VIOLATION OF FOURTH AMENDMENT
### SEARCH AND SEIZURE
### AGAINST DONALD MOORE IN HIS
### IN HIS INDIVIDUAL CAPACITY

291.    Johnson incorporates all prior paragraphs.

292.    *First*, Defendant Moore examined Johnson's personal information, and

293.    *Second*, the search was not reasonable because the search was not necessary in connection with any investigation of Johnson; and

---

[26] See 8th Cir. Mod. Jur. Instrucs, § 13.40: Elements of Claim: First Amendment Retaliation (42 U.S.C. § 1983), and see *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 272-73 (2016), Defendants' reasons are what counts.

[27] See 8th Cir. Mod. Jur. Instrucs, § 13.70 Damages: Actual (42 U.S.C. § 1983), 13.72 Damages: Punitive (42 U.S.C. § 1983), and see *Wentz v. Maryland Cas. Co.*, 869 F.2d 1153, 1155 (8th Cir. 1989); *Woods v. City of St. Louis, Missouri*, 170 F.4th 1164, 1174 (8th Cir. 2026).

294.   *Third*, as a direct result, Johnson was damaged.[28]

295.   The conduct of Defendants described in this Count was malicious or recklessly indifferent to Johnson's Fourth Amendment rights, and therefore Johnson is entitled to punitive damages.

WHEREFORE, Johnson prays for compensatory damages and for punitive damages for unreasonable search against Defendant Moore in his individual capacity in a fair and reasonable amount, for reasonable attorney's fees, for costs, and for such other relief as the court finds to be just, meet and reasonable.

**COUNT III**

**RSMO §105.055 WHISTLEBLOWER RETALIATION
AGAINST THE CITY OF PEVELY**

296.   Johnson incorporates all prior paragraphs.

297.   *First*, Johnson was a public employee of the City of Pevely;[29]

298.   *Second*, Defendant City of Pevely was a public employer of Johnson;[30]

299.   *Third*, for purposes of this cause of action, Andrew Hixson or, in the alternative, Jamie Mayberry, were supervisors of Johnson;[31]

---

[28] 8th Cir Model Jury Instructions, § 4.40.  See *City of Ontario, Cal. v. Quon*, 560 U.S. 746, 756 (2010), *O'Connor v. Ortega,* 480 U.S. 709 (1987), *U.S. v. Bailey,* 272 F.Supp.2d 822, 836 (2003) and *Bass v Anoka County,* 998 F.Supp.2d 813 (D. Minn 2014).

[29] Public employee, as defined in § 105.055.1 (2); See Section 105.055 RSMo, which allows such claims to be brought against the "public employer." See Also*, Schreiber v. Nelson,* No. 4:24 CV 1587 JMB, 2025 WL 212314, at *1 (E.D. Mo. Jan. 16, 2025).

[30] Public employer, as defined in § 105.055.1 (3)

[31] "Supervisor" pursuant to § 105.055.3, as defined "a person having authority delegated by an employer to hire, transfer, suspend, recall, promote, assign, or discharge another employee or to recommend such action."  *Miller v. Missouri House of Representatives,* 725 S.W.3d 650, 658 (2025).

300. *Fourth*, Johnson disclosed information to Andrew Hixson, Allison Sweeney, Jamie Mayberry, Linda Miles, Ashton Cooke and/or Mayor Markus that Johnson reasonably believed evidenced at least one of the following:

    a.       A violation of any law, rule or regulation;

    b.       Mismanagement,

    c.       A gross waste of funds;

    d.       An abuse of authority,

    e.       A violation of policy, or

    f.       A waste of public resources;[32]

301. *Fifth*, Andrew Hixson or, in the alternative, Jamie Mayberry and/or Donald Moore terminated the employment of Johnson as a result of Johnson's disclosure.[33]

302. *Sixth*, as a direct result Johnson was damaged.

WHEREFORE, Johnson prays for compensatory damages for whistleblower retaliation against the City of Pevely in a fair and reasonable amount, for reasonable attorney's fees, for costs, and for such other relief as the court finds to be just, meet and reasonable.

## COUNT IV

### POLICE OFFICER'S BILL OF RIGHTS, INJUNCTIVE RELIEF
### AGAINST THE CITY OF PEVELY

303. JOHNSON incorporates all prior paragraphs.

---

[32] § 105.055.3

[33] It is Johnson's burden to show the following by clear and convincing evidence.  See § 105.055.7(3):

> A public employee shall show by clear and convincing evidence that he or she or a person acting on his or her behalf has reported or was about to report, verbally or in writing, a prohibited activity or a suspected prohibited activity. Upon such a showing, the burden shall be on the public employer to demonstrate that the disciplinary action was not the result of such a report.

34

304. In the course of Johnson's termination, Defendant violated Johnson's rights under the Police Officer's Bill of Rights, RSMo. 590.502, ('the Act").

305. The remedy for a violation of an officer's rights under the Act is for the court to void the action, RSMo. 590.502.10, and award attorneys' fees.

306. Johnson does not seek reinstatement but only that the record indicating that he was terminated be declared void.

WHEREFORE, Johnson prays the court for an injunctive order declaring Johnson's termination void, awarding Johnson his reasonable attorneys' fees, and costs, and for such other relief as the court finds to be just, meet and reasonable.

Respectfully Submitted,

| | |
|---|---|
| /s/ W. Bevis Schock  . | /s/ Erich Vieth    |
| W. Bevis Schock, 32551MO | Erich Vieth, 29850MO |
| 7777 Bonhomme Ave., Ste. 1300 | 20 South Sarah Street |
| St. Louis, MO  63105 | St. Louis, MO 63108 |
| wbschock@schocklaw.com | erichviethattorney@gmail.com |
| cell:     314-757-0604 | Voice: (314) 604-3454 |
| office:   314-726-2322 | Fax: (314) 310-1181 |
| Attorney for Johnson | Attorney for Johnson |